UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| M.L. JOHNSON FAMILY PROPERTIES, LLC, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) Civil No. 14-78-ART<br>) |
| v. | )<br>) **MEMORANDUM OPINION &**<br>) **ORDER** |
| SALLY JEWELL, *Secretary of the Interior*, | )<br>)<br>) |
| Defendant, | )<br>)<br>) |
| and | )<br>)<br>) |
| PREMIER ELKHORN COAL COMPANY, | )<br>)<br>) |
| Intervening Defendant. | )<br>)<br>) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Property rights matter. So too do the efforts of coal companies: They offer employment to millions and provide affordable energy to consumers. Sometimes, a company's interest in conducting mining operations will leave it at odds with the owner of the surface estate. In such situations, should the law prefer the surface owner or the coal company? The Constitution wisely leaves such questions of policy to the States and the elected branches, not the Courts. And here, the States and the political branches have spoken with one voice: Coal companies must comply with certain minimum permitting requirements before they may mine a surface owner's estate. Because the coal company in

this case failed to comply with those minimum requirements, it must immediately cease mining the plaintiff's land.

## BACKGROUND

M.L. Johnson Family Properties, LLC, is a collection of landowners (organized as a limited liability company) who want Premier Elkhorn Coal Company to cease surface mining operations on their property. To that end, they filed this suit against the Secretary of the Interior, seeking an injunction ordering her to halt Elkhorn's mining activities. Although Elkhorn obtained a permit from the relevant Kentucky agency, the plaintiff claims that the permit fails to comply with the minimum federal requirements governing surface mining. The source of those requirements is the Surface Mining Control and Reclamation Act of 1977 (the Act), 30 U.S.C. § 1201 *et seq.*

The Act establishes a system of "cooperative federalism": It prescribes certain minimum national requirements applicable to surface mining, but it allows States to assume responsibility for enforcing them. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981). The Act invites States to apply to regulate surface mining within their borders. 30 U.S.C. § 1253(a). To accept the invitation, a State must submit to the Secretary a proposed regulatory program, demonstrating that the State is ready, willing, and able to enforce the Act's requirements. *Id.* A proposed State regulatory regime may be more demanding than the Act, but its requirements must be at least as stringent as the Act's—that is, the Act sets a national floor governing surface mining, but no ceiling. *See id.* Once the Secretary approves a State's proposed regulatory regime, then the State "assume[s] exclusive jurisdiction over the regulation of surface coal mining" on non-federal land. *Id.* The phrase "exclusive jurisdiction" means precisely what it suggests: After the Secretary signs off on a

State's program, federal law no longer directly governs surface mining in the State. *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 295 (4th Cir. 2001) ("When a State's program has been approved by the Secretary of the Interior, we can look only to State law on matters involving the enforcement of the minimum national standards."); *accord Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 316 (3d Cir. 2002). The Secretary approved Kentucky's proposed regulatory program in 1982. 30 C.F.R. § 917.10.

That is not to say, however, that federal law is irrelevant to the conduct of surface mining in Kentucky. The Act's grant of exclusive jurisdiction carries with it a notable caveat. Federal law charges the Secretary with ensuring that a State's administration of its approved program comports with the Act's minimum requirements. 30 U.S.C. § 1253(a) (providing for exclusive State jurisdiction "except as provided" in the Act's enforcement provision). If a State fails to comply with the Act's requirements, then the Act may require the Secretary to intervene. *See* 30 U.S.C. § 1271(a); *Hess*, 297 F.3d at 328 ("The Secretary may step in to withdraw approval of the state's ineffective program or a part thereof and to enforce, in federal court, federal provisions and sanctions for violations of the minimum standards set forth in [the Act].").

Whether to enforce the Act is not left entirely to the Secretary's discretion. Crucially, the Act contains a "citizen suit" provision—a device by which citizens may force the Secretary to spring into action. 30 U.S.C. § 1270(a)(2). Section 1270 allows a private party to "compel compliance" with the Act by suing the Secretary to perform "any act or duty under this chapter which is not discretionary." *Id.* Section 1270 is a rather extraordinary remedy: Not every day can an aggrieved citizen command the Secretary of the Interior to do his bidding. Perhaps for that reason, § 1270 usually requires the party seeking to enlist the

3

Secretary to provide her with 60 days to fix the problem before he may initiate a suit. 30 U.S.C. § 1270(b)(2). The 60-day waiting period does not apply, however, when time is of the essence: If the alleged violation either (1) poses "an imminent threat" to the plaintiff's health or safety, or (2) "would immediately affect a legal interest of the plaintiff," then the party may notify the Secretary of the problem and sue immediately. *Id.*

M.L. Johnson brought this suit pursuant to § 1270, alleging that Elkhorn's permit application did not contain certain information that the Act requires. *See generally* 30 U.S.C. § 1260(b) (enumerating information that a State must require from an applicant before it may approve a permit). Section 1271 requires the Secretary to intervene whenever she has reason to believe that a person is violating "any permit condition" the Act prescribes. 30 U.S.C. § 1271(a)(1). Because the obligation to intervene is couched in mandatory terms, the plaintiff may seek to compel the Secretary to do so via a suit under § 1270. And M.L. Johnson wants that relief right away: It seeks a preliminary injunction compelling the Secretary to inspect Elkhorn's permit. The Secretary responded that the 60-day period had not expired, and that Elkhorn's permit application contained the necessary information.

To be eligible for a preliminary injunction, the plaintiff must first demonstrate "a strong likelihood of success on the merits," *City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-2087, 2014 WL 1758913, at *2 (6th Cir. May 5, 2014) (en banc). For the reasons explained below, the plaintiff has carried that burden. M.L. Johnson was not required to wait 60 days before filing this action, and Elkhorn's permit application did not comply with the Act's minimum requirements. The Court will therefore grant the motion for a preliminary injunction, order the Secretary to conduct an inspection, and halt Elkhorn's mining operation on the plaintiff's land during the pendency of that inspection.

# I. Section 1270's Sixty-Day Waiting Period Does Not Apply, Because the Violation Will "immediately affect a legal interest of the plaintiff."

It is undisputed that the plaintiff commenced this suit less than 60 days after giving the Secretary notice of the violation. The plaintiff thus had no right to invoke § 1270 unless an exception applied: The violation must have imminently endangered the plaintiff's health or safety, or it must have threatened to "immediately affect a legal interest of the plaintiff." 30 U.S.C. § 1270(b)(2).

The latter exception applies here. Although neither party cites any authority defining the term "legal interest," the plaintiff definitely has the requisite stake in this litigation. The plain meaning of "legal interest" is capacious, *see* Black's Law Dictionary 828 (8th ed. 2004) (explaining that "interest" refers to "rights, privileges, powers, and immunities," especially rights in property), and a competent speaker of legal English would say that one has a legal interest in protecting his property from any sort of activity that threatens to dramatically decrease its value. It is undisputed that Elkhorn's surface mining requires the felling of trees and the infliction of other substantial damage on the plaintiff's estate. And there is no doubt that the threat is immediate: Mining has proceeded as this litigation has progressed.

Federal Rule of Civil Procedure 24(a) provides an imperfect but apt analogy, and it confirms the broad reach of the phrase "legal interest." Rule 24(a) allows for intervention as of right when the intervenor has "an interest" in the litigation that he may not be able to vindicate absent intervention. The Sixth Circuit has interpreted the Rule to require that the intervenor have "a substantial legal interest in the subject matter of the case." *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007). That standard is not terribly demanding. Although the inquiry is fact-specific, a "substantial legal interest"

5

may exist even where the party would not have had standing to initiate the action in the first place. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) ("This circuit has opted for a rather expansive notion of the interest sufficient to invoke intervention of right."). To have standing, a plaintiff must have suffered a "concrete," "particularized," "actual" injury that is "fairly traceable to the challenged action of the defendant" and capable of being redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Nobody suggests that the plaintiff here lacks the requirements of Article III standing, suggesting that its "legal interest" is "substantial."

Ultimately, there is no need to decide precisely what "legal interest" means in § 1270(b)(2). It suffices for present purposes to hold that, where a party faces the immediate surface mining of his property, he faces a threat that could "immediately affect" his "legal interest" in the property. The plaintiff therefore was not required to wait 60 days before initiating this action.

## II. Elkhorn's Permit Application Did Not Contain All The Information That The Act Requires.

The Act prohibits regulators from approving applications for surface mining permits unless the applicant provides certain information. *See* 30 U.S.C. § 1260(b). The condition at issue here applies only to applicants who seek to mine a parcel with severed surface and mineral estates. 30 U.S.C. § 1260(b)(6). An applicant seeking to mine such a parcel must submit one of the following three pieces of information: (A) the written consent "of the surface owner," or (B) a conveyance that expressly authorizes surface mining; or (C) a conveyance that is silent as to surface mining, in which case State law controls "the surface-

subsurface legal relationship." 30 U.S.C. § 1260(b)(6)(A)–(C). It is undisputed that the parcel's surface and mineral estates have been severed, so Kentucky's regulatory authority could approve Elkhorn's permit application only if Elkhorn submitted the information contemplated by subsection (A), (B), or (C). Alan Luttrell, the Kentucky regulator who approved Elkhorn's application, testified that he approved it under subsection (A)—that is, that Elkhorn submitted "the written consent of the surface owner to the extraction of coal by surface mining methods." 30 U.S.C. § 1260(b)(6)(A).[1]

But did Elkhorn really submit the consent required by § 1260(b)(6)(A)? That depends on how one reads "of the surface owner." The six individuals who are members of the plaintiff in this case hold a majority of the parcel as tenants-in-common, and they never consented to the surface mining of their land. Pike Letcher Land Company owns 25% of the parcel as a tenant-in-common with the plaintiff, and it expressly consented to surface mining. What result when the surface estate has multiple owners, some of whom consent and some of whom do not? Does the consent of "a" surface owner satisfy § 1260(b)(6)(A)?

At first blush, the Act is silent on this score. It envisions only "the surface owner." Nevertheless, well-established canons of statutory interpretation all point to the same conclusion: Subsection (A) requires the consent of *all* surface owners. The consent of "a" surface owner does not suffice.

---

[1] The relevant portions of the applicable state and federal regulations speak in precisely the same terms as the statute. *See* 30 C.F.R. § 778.15(b)(1) (requiring "the written consent of the surface owner"); 405 Ky. Admin. Regs. 8:030 § 4(2)(a) (requiring "the written consent of the surface owner."). Although this opinion is cast in terms of the federal statute, the Court interprets the federal and state regulations to carry the same meaning. After all, as an analytical matter, the Kentucky regulation cannot be less demanding than the federal requirement. *See* 30 C.F.R. § 917.10 (approving Kentucky's program because it complied with the Act). Thus, if Kentucky's issuance of the permit violated the minimum requirements of the Act, it also violated Kentucky's regulatory analogue.

### A. When A Term Appears Multiple Times In The Same Act, It Usually Means The Same Thing In Both Places.

Although the term "surface owner" in § 1260 is undefined, that phrase carries a particular meaning in a different section of the Act. Section 1304 defines the rights of surface owners on federal lands. 30 U.S.C. § 1304(e). It provides that: "For the purpose of this section the term 'surface owner' means the natural person *or persons* . . . who [have various interests in the surface estate]." *Id.* (emphasis added). The definition applies by its terms to § 1304 only, but it still provides important guidance for interpreting § 1260. "[W]ords repeated in different parts of the same statute generally have the same meaning." *Law v. Siegel*, 134 S. Ct. 1188, 1195 (2014) (applying 11 U.S.C. § 503(b)'s definition of "administrative expenses" to the same phrase in § 522(k)). If Congress intended to depart from that canon in the Act, it left no trail of bread crumbs suggesting as much to the curious reader. Section 1304's definition of "surface owner" to include the plural thus suggests that the same phrase in § 1260 also encompasses the plural where there are multiple owners—meaning that an applicant in such a case must submit the written consent of "the surface *owners*."

### B. The Singular Presumptively Includes The Plural.

The phrase "surface owner" presumptively includes the plural "surface owners." The Dictionary Act provides rules for interpreting "any Act of Congress, unless the context indicates otherwise." 1 U.S.C. § 1. The first of those rules is that "words importing the singular include and apply to several persons, parties or things." *Id.*; *see also Central & S. Motor Freight Tariff Ass'n, Inc. v. United States*, 843 F.2d 886, 894 (6th Cir. 1988) (rejecting an argument because it ignored "a basic principle of statutory interpretation—that

the singular includes the plural . . . ."). So, absent some statutory context suggesting that Congress intended the singular to exclude the plural here, "the surface owner" should be read to mean "the surface owners" in cases where there is more than one.

Although there is some such contextual evidence, it is too weak to carry the day. Section 1257 requires an applicant to list "every legal owner of record of the property (surface and mineral)," and "the names and addresses of the owners of record of all surface and subsurface areas adjacent to any part of the permit area." 30 U.S.C. § 1257(b)(1), (2). So, the argument goes, Congress knew how to refer to plural owners when it wanted to. Neither passage, however, is analogous to § 1260(b)(6)(A), which imagines a single surface estate. Section 1257(b)(1) refers to the owners of both a mineral estate and a surface estate, so its use of the plural may well be consistent with § 1260(b), as it simply envisions one owner of the surface estate and a different owner of the mineral estate. So too with § 1257(b)(2), which refers to the several "surface and subsurface areas" surrounding the parcel that the applicant is applying to mine. Neither section uses the plural to refer to the owners of a single mineral or surface estate. These passages therefore cannot overcome the understanding prescribed by the Dictionary Act—particularly when that understanding is confirmed by § 1304's definition.

### C. Congress Employed The Definite Article In Section 1260.

Congress's use of the definite article ("*the* surface owner") indicates that the consent of "a" surface owner cannot suffice. *See* 30 U.S.C. § 1260(b)(6)(A). "Unlike 'a' or 'an,' that definite article suggests specificity." *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir. 2013). If Congress meant to require the consent of "a surface owner," then it could simply have said that. Indeed, doing so would have carried at least one additional perk:

9

Curious readers would not have had to guess whether the term "surface owner" imported the plural, for the consent of one surface owner (whether he was the only one or not) would always suffice. But Congress did not use that term, and its use of the definite article fits smoothly even if "the surface owner" is read to mean "the surface owners." Words have meaning—even small ones like "the." The Court has no authority to ignore the precise phrasing Congress selected.

### D. The Secretary's Contrary Interpretation Is Implausible.

Despite the three signs pointing in the same direction, the Secretary contends that §1260(b)(6)(A) actually requires only the amount of consent required under applicable State law. Because Kentucky's common law of property allows one tenant-in-common to consent to surface mining on an entire parcel, the Secretary concludes that the consent of one tenant-in-common also suffices to satisfy § 1260(b)(6)(A).

The Secretary's argument is unpersuasive—when Congress meant to punt to State law, it did so expressly. Indeed, it did so within the very same sentence in which it used the phrase "the surface owner." Section 1260(b)(6)(C), provides that if the conveyance is silent as to surface mining, then "the surface-subsurface legal relationship shall be determined *in accordance with State law* . . . ." (Emphasis added). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration omitted). That presumption seems particularly apt where the relevant difference occurs within the same breath. The canons discussed above and the implausibility of the Secretary's view combine to confirm that § 1260(b)(6)(A) requires the consent of all the surface owners when there is

more than one.  Therefore, § 1260(b) prohibited Kentucky from issuing Elkhorn its permit based on the consent of the Pike Letcher Land Company only.[2]

### III. The Plaintiff Is Entitled To A Preliminary Injunction Ordering The Secretary To Inspect Elkhorn's Permit.

To review: The Secretary has a mandatory duty to intervene when she learns that a person is mining in violation of one of the Act's "permit condition[s]." 30 U.S.C. § 1271(a)(1). Kentucky's issuance of Elkhorn's permit violated the Act's minimum requirements, because Elkhorn submitted the consent of one surface owner only, when § 1260(b)(6)(A) required it to submit the consent of all the surface owners. The plaintiff sued immediately after notifying the Secretary of the problem, and the usual 60-day waiting period does not bar this suit.

So what remedy does the Act prescribe in a situation like this? Usually, the first step is for the Secretary to inform the State regulatory authority of the violation. 30 U.S.C. § 1271(a)(1). The Secretary must immediately order an inspection of the relevant mining operation, however, if the plaintiff provides "adequate proof that an imminent danger of significant environmental harm exists and that the State has failed to take appropriate action." *Id.* Kentucky has taken no action to cure the violation, because it shares the Secretary's reading of § 1260(b)(6)(A). And although a permitting violation might not be thought to pose any risk of environmental harm, the Secretary's regulations provide

---

[2]At one point in this litigation, the Secretary suggested a sort of harmless error theory: That even if Kentucky illegally issued the permit under its analogue to 30 U.S.C. § 1260(b)(6)(A), the permit is valid because it could have been issued under the analogue to 30 U.S.C. § 1260(b)(6)(C). The Court invited the Secretary to brief this question, and it failed to develop that argument, insisting instead on its main argument, that the consent of one surface owner suffices. R. 24 at 3–4. In light of Luttrell's clear testimony, this case is about a permit issued under the Kentucky analogue to § 1260(b)(6)(A). And in light of the Secretary's decision not to pursue its harmless error theory, the Court will not venture a guess—which would closely resemble an advisory opinion—regarding whether this same application could have been approved under the analogue to § 1260(b)(6)(C).

11

otherwise. "Surface coal mining operations conducted by any person without a valid surface coal mining permit constitute a condition or practice which causes . . . significant imminent environmental harm . . . ." 30 C.F.R. § 843.11(a)(2). Per the Secretary's own rules, she must therefore immediately order an inspection of Elkhorn's mining operation, because it is mining pursuant to an invalid permit.

Or at least a plain reading would suggest as much. The Secretary resists that view, insisting that the permit is "valid" even if it fails to comply with the Act's minimum requirements. The Secretary's view is not particularly nuanced: "Defendant suggests that the reference to 'valid permit' in 30 C.F.R. § 843.11(a)(2) means essentially any permit in existence." R. 9 at 11–12. There is nothing wrong with staking out bold legal positions, but the Secretary is writing checks that the regulation cannot cash. The regulation speaks in terms of mining "without a *valid*" permit. (Emphasis added). The Secretary's interpretation reads "valid" right out of the statute. The word has to mean something, and its colloquial meaning weighs heavily in favor of the plaintiff. *See* Black's Law Dictionary 1586 (8th ed. 2004) (defining "valid" to mean "legally sufficient"). Elkhorn's permit, as the Court has explained, is not legally sufficient. It fails to comply with the Act's minimum requirements. The Secretary has therefore bound herself to conclude that Elkhorn's mining operation poses an imminent risk of environmental harm, s*ee* 30 C.F.R. § 843.11(a)(2), so she must immediately order an inspection. *See* 30 U.S.C. § 1271(a)(1).

After the inspection, the Secretary will have to decide whether to order a cessation of Elkhorn's operation. *See* 30 U.S.C. § 1271(a)(2). The Court cannot order her to require cessation at this point, because that determination must be made after the inspection. *See id.* (requiring cessation "[w]hen, *on the basis of any Federal inspection*, the Secretary or his

authorized representative determines . . . .") (emphasis added). The plaintiff is of course free to return to this Court if it perceives another failure by the Secretary to comply with a mandatory duty required by the Act.

In the interim, the Court will grant the plaintiff's motion for a preliminary injunction, staying Elkhorn's mining operation on the plaintiff's property. The Court considers four factors when evaluating a motion for a preliminary injunction: (1) Whether the plaintiff has demonstrated a strong likelihood of success on the merits; (2) whether the plaintiff faces an irreparable injury absent the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, No. 12-2087, 2014 WL 1758913, at *2 (6th Cir. May 5, 2014) (en banc).

As explained above, the plaintiff has demonstrated a strong likelihood of success on the merits, and the plaintiff faces irreparable injury to its land absent the injunction. The third and fourth factors are admittedly more difficult. No doubt, enjoining Elkhorn's mining carries serious costs: Many Elkhorn employees may be temporarily put out of work, and the public at large will not be free to purchase the coal that will remain in the ground because of the injunction. But the public has similarly weighty interests in ensuring that states and mining companies comply with the minimum national requirements Congress has prescribed for surface mining. Particularly so where, as here, the violation goes to a core purpose of the Act: The protection of surface owners from the travails of surface mining. *See* 30 U.S.C. § 1202(b) (explaining that a purpose of the Act is to "assure that the rights of surface landowners . . . are fully protected from [surface mining] operations."). At the end of the day, Congress is better positioned than this Court to weigh the public interest about matters

13

of national importance, and Congress has concluded that no permit should issue unless the applicant includes certain information demonstrating its right to surface mine a landowner's property. Because Elkhorn did not include that information, the public interest is best served by staying Elkhorn's mining operations until the Secretary completes her inspection.

Accordingly, it is **ORDERED** that:

(1) The plaintiff's motion for a preliminary injunction and a temporary restraining order, R. 5, is **GRANTED IN PART AND DENIED IN PART**.

(2) The Secretary **SHALL IMMEDIATELY INSPECT** Elkhorn's mining operation on the plaintiff's parcel, as required by 30 U.S.C. § 1271(a)(1). After the Secretary completes the inspection, she **SHALL REPORT** to this Court whether she plans to take further action.

(3) The plaintiff's motion for a preliminary injunction, ordering Elkhorn to cease mining the plaintiff's parcel during the pendency of the Secretary's inspection is **GRANTED**. The Secretary can evaluate in the first instance whether to order cessation after completing her inspection. If after the Secretary's inspection, the plaintiff believes she has illegally refused to order cessation, then it may move for a temporary restraining order or a new injunction. Elkhorn **SHALL IMMEDIATELY CEASE** surface mining operations on the plaintiff's parcel until the Secretary completes her inspection and decides whether to take further action.

(4) The plaintiff need not post a bond in this matter. Although Rule 65(c) speaks in apparently mandatory terms, "the rule in our circuit has long been that the district court possesses discretion over *whether* to require the posting of

security." *Appalachian Regional Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (internal quotation omitted). In its opening brief the plaintiff argued that no bond should be required. R. 5 at 16 n.8. The defendants evidently had no quarrel with that proposal: Neither contested the point in their responses, and neither has separately requested that the Court post a bond. *See* R. 8; R. 9. Accordingly, insofar as this issue has been raised at all, the defendants have waived their right to contest the plaintiff's position. *See Appalachian Regional Healthcare, Inc.*, 714 F.3d at 431 ("A court errs when it fails to expressly consider the question of requiring a bond *when the issue has been raised*.") (internal alterations, ellipsis, and quotation marks omitted) (emphasis added).

(5) The plaintiff's request for a temporary restraining order is **DENIED AS MOOT**.

(6) The plaintiff's request that the Court compel the Secretary to issue a cessation order under 30 U.S.C. § 1270(a)(2) is **DENIED WITHOUT PREJUDICE**. The Court will reconsider that motion, if necessary, after the Secretary completes her inspection.

(7) This Order is immediately appealable. 28 U.S.C. § 1292(a)(1).

This the 13th day of June, 2014.



Signed By:
*Amul R. Thapar* AT
United States District Judge